## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

CHILDREN'S HEALTH CARE d/b/a
CHILDREN'S HOSPITALS AND
CLINICS OF MINNESOTA; GILLETTE
CHILDREN'S SPECIALTY
HEALTHCARE,

                Plaintiffs,

      v.

Case No. 0:16-cv-4064-WMW-SER

THOMAS PRICE, in his official capacity,
Secretary, Department of Health and
Human Services; PATRICK CONWAY,
in his official capacity, Acting
Administrator, Centers for Medicare and
Medicaid Services; and the CENTERS
FOR MEDICARE AND MEDICAID
SERVICES,

                Defendants.

## SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF[1]

Plaintiffs Children's Hospitals and Clinics of Minnesota ("Children's

Minnesota") and Gillette Children's Specialty Healthcare ("Gillette") (together, referred

to as "Plaintiffs") seek declaratory and injunctive relief against Defendants  Thomas

Price, Patrick Conway, and the Centers for Medicare and Medicaid Services ("CMS")

---

[1] The Second Amended Complaint corrects the overpayments identified for Children's
Minnesota for DSH years 2011 and 2013, clarifies related text, and updates the
Defendant parties to reflect the new Secretary of Health and Human Services and acting
administrator of the Centers for Medicare and Medicaid Services, pursuant to Rule 25(d)
of the Federal Rules of Civil Procedure.

for violations of the Medicaid Act and the Administrative Procedure Act ("APA").  In

support  thereof, Plaintiffs state as follows:

**INTRODUCTION**

1.   Plaintiff Children's Minnesota is a not-for-profit pediatric hospital located in the

Minneapolis-St. Paul metropolitan area and is dedicated to the treatment and special

needs of children and the advancement of pediatric medicine.  Children's Minnesota is

the largest pediatric health system in the Upper Midwest and is nationally recognized as

one of the best children's hospitals in the United States.  Children with critical illnesses

and special needs are sent to Children's Minnesota for treatment from throughout the

Upper Midwest region.  Children's Minnesota treats these critically ill children regardless

of whether their families have health insurance or their families have the ability to pay for

their care.

2.   Plaintiff Gillette is an independent, not-for-profit pediatric hospital,[2] with its main

campus located in St. Paul, Minnesota.  Gillette operates outpatient clinics throughout the

Minneapolis-St. Paul metropolitan area and outreach sites throughout the greater

Minnesota region and treats patients from every county in Minnesota.  Gillette was

established to provide care for children with significant musculoskeletal and neurological

conditions that often result in difficult physical disability; it is a recognized leader in the

care and treatment of rare, complex or traumatic conditions affecting these systems.

---

[2] Gillette was established in 1897 as the first state-funded hospital in the United States
dedicated to treating children who have disabilities; Gillette has been an independent,
nonprofit hospital since 1988.

Many Gillette patients have multiple conditions (*e.g.*, cerebral palsy with medically intractable epilepsy). As a result of this, Gillette has the highest average case mix index (CMI), a measure which reflects the diversity, clinical complexity and the needs for resources in the population of patients cared for in a hospital, of any Minnesota hospital—adult or pediatric. Gillette's care model emphasizes medical, surgical and therapeutic interventions that improve functional ability, reduce pain, and prolong life. The majority of Gillette's patients have a lifelong physical disability as a result of their condition and are considered medically fragile. Because there is no cure for the vast majority of the multiple overlying and disabling conditions Gillette treats, these patients require lifelong care. Gillette provides care to these patients regardless of whether their families have health insurance or the ability to pay for their care.

3. Plaintiffs treat child patients who are eligible to receive benefits from the Medicaid program, the medical assistance program established under Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.* (the "Medicaid Act"). Approximately 57% of the children who have inpatient stays at Children's Minnesota are eligible to receive Medicaid (approximately 8,400 children annually). In 2015, approximately 68.0% of inpatient days at Gillette were for patients who are eligible to receive Medicaid (approximately 1,260 patients annually).

4. Congress established the Disproportionate Share Hospital ("DSH") program under the Medicaid Act to help relieve the financial burden on certain hospitals that treat a disproportionate share of Medicaid and uninsured patients. 42 U.S.C. § 1396r-4. Under

Minnesota's State Medicaid Plan, Plaintiffs qualify to receive payments under the DSH program and have each received millions of dollars in DSH funding.

5.   The DSH program helps to relieve the financial burden on DSH hospitals by reimbursing qualifying hospitals for the treatment they provide to Medicaid and uninsured patients through payment adjustments.   42 U.S.C. § 1396r-4(g)(1)(A).   These payment supplements may not exceed:  (1) the costs of services to individuals eligible for Medicaid, net of payments under the Medicaid Act (hereinafter the "Medicaid Shortfall"); plus (2) the costs of services to individuals who have no health insurance or other third-party coverage, net of payments by those uninsured patients.   *Id.*   The product of this statutory equation is known as a DSH's hospital-specific DSH payment limit.   Only the first part of this  statutory equation—the calculation of the Medicaid Shortfall—is at issue in this case.

6.   The Medicaid Act expressly provides that, to calculate a DSH hospital's Medicaid Shortfall, only Medicaid payments are to be subtracted from costs.   42 U.S.C. § 1396r-4(g)(1)(A).  CMS's regulations similarly specify that only Medicaid payments are to be considered in the Medicaid Shortfall calculation.   42 C.F.R. § 447.299(c)(16).

7.   Without notice-and-comment rulemaking under the APA, CMS instituted and began for the first time enforcing a so-called "policy clarification" to the  regulations contained in 42 C.F.R. § 447.299.  This "policy  clarification" appeared in a January 2010 document responding to frequently asked questions ("FAQ") called, "Additional Information on the DSH  Reporting and Audit Requirements" posted on Defendant CMS's

website.[3]  The "policy clarification" at issue in this Complaint was set  forth in responses to question numbered 33.

8.  FAQ 33 stipulated that DSH hospitals must include in the calculation of their Medicaid Shortfall third party non-Medicaid payments such as private health insurance for Medicaid eligible patients.

9.  Because 42 U.S.C. § 1396r-4(g)(1)(A) and 42 C.F.R. § 447.299(c)(16) unambiguously require only Medicaid payments be contained  in the Medicaid Shortfall calculation, the "policy clarification" set forth in FAQ 33 constitutes a substantive amendment to the statute, and the regulations.  This substantive amendment is contrary to Congress's intent in enacting the Medicaid Act, and is an unreasonable interpretation of the Medicaid Act.  Moreover, the substantive amendment was not promulgated using notice-and-comment rulemaking under the APA.

10.     Two federal district courts have issued preliminary injunctions against Defendants from administering, enforcing or implementing FAQ 33.  The United States District Court for the District of New Hampshire (McCafferty, J.) preliminarily enjoined Defendants from "enforcing, applying, or implementing the policies referenced in FAQ 33…."  *New Hampshire Hospital Association, et al. v. Sylvia Mathews Burwell et al.*, No. 15-cv-460, 2016 WL 1048023 (Mar. 11, 2016).  In that case, the district court found a likelihood of success on the merits of plaintiffs' claim and ruled that FAQ 33 "represent[s] an unreasonable interpretation of the Medicaid Act," was "a substantive rule

---

[3] Available at https://www.medicaid.gov/medicaid/financing-and-reimbursement/downloads/part-1-additional-info-on-dsh-reporting-and-auditing.pdf (last visited January 9, 2017).

because it had the force and effect of law," and "should have been issued in accordance with the notice-and-comment provisions of § 553" of the APA. *Id*. at *16.

11. The United States District Court for the District of Columbia (Sullivan, J.) preliminarily enjoined the Defendants "from enforcing, applying, or implementing FAQ No. 33." *Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 247 (D.D.C. 2014). In that case, the district court found that the plaintiffs had shown a likelihood of success on the merits of their claim that the policy referenced in FAQ 33 relating to private health insurance payments made "a substantive change to the formula for calculating a hospital's DSH limit," constituted final agency action, and had not been promulgated using the notice-and-comment provisions of the APA. *Id.* at 241.

12. Despite these unambiguous federal district court orders, Defendants continue to apply, enforce and implement the policy of FAQ 33 relating to the inclusion of private health insurance payments in the calculation of a DSH Medicaid Shortfall in all jurisdictions (including Minnesota) except those few states where the two district court orders are in force.

13. On May 1, 2015, Defendant CMS wrote the Director of Missouri Health Net stating CMS's position on the applicability of FAQ 33. CMS wrote that "in Texas and Washington … the enforcement of FAQ 33 is enjoined and that CMS will take no action to recoup any federal DSH funds provided to Texas and Washington based on a failure of those two states to take action consistent with the interpretation contained in FAQ33. For all other states … CMS may disallow federal financial participation if a state does not comply with the policy articulated in FAQ 33."

14.     Because of the illegal application of FAQ 33, Plaintiffs are at imminent risk of having their DSH payments vacated.  Children's Minnesota is at imminent risk of having at least $31.8 million dollars of DSH funds already received for DSH years 2011, 2012 and 2013 recouped as an "overpayment."  Gillette is at imminent risk of having at least $9.2 million dollars of DSH funds already received for DSH years 2011, 2012, and 2013 recouped as an "overpayment."

15.     Because of the illegal application of FAQ 33, Children's Minnesota will lose approximately $85.5 million dollars of DSH funding for 2011-2016, including projected DSH funds for DSH year 2016.  Similarly, because of the illegal application of FAQ 33, Gillette will lose approximately $26.2 million dollars of DSH funding for 2011-2016, including projected DSH funds for DSH year 2016.

16.     Application of the illegal policy referenced in FAQ 33 will also eliminate by tens of millions of dollars the amount of DSH funding Plaintiffs are entitled to receive after 2016.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 28 U.S.C. § 1331, 28 U.S.C. §§ 2201, 2202, and 5 U.S.C. §§ 704-706, as this action presents a case and controversy under the Medicaid Act, the APA, and  the Declaratory Judgment Act, 28 U.S.C. § 2201.

18.     Venue lies in this district under 28 U.S.C. § 1391 in that Defendants Price and Conway are officers and employees of a United States agency, Plaintiffs reside in Minnesota, and no real property is involved in the action.  Venue also lies in this district

under 5 U.S.C. § 703 because there is no special statutory procedure for appeal and this court is a court of competent jurisdiction.

## THE PARTIES

19.     Plaintiff Children's Minnesota is a not-for-profit pediatric hospital located in the Minneapolis-St. Paul metropolitan area and is dedicated to the treatment and special needs of children and the advancement of pediatric medicine. Children's Minnesota is the largest pediatric health system in the Upper Midwest and is nationally recognized as one of the best children's hospitals in the United States. Children with critical illnesses and special needs are sent to Children's Minnesota for treatment from throughout the Upper Midwest region. Children's Minnesota treats these critically ill children regardless of whether their families have health insurance or their families have the ability to pay for their care.

20.     Plaintiff Gillette is a not-for-profit pediatric hospital located in St. Paul, Minnesota dedicated to the treatment of and advancement of care for children with severe and complex musculoskeletal and neurological conditions resulting from genetic conditions, trauma, infection and other causes. Gillette also serves patients with rare medical needs that require highly trained subspecialty providers not available in most health systems. Because of the depth and breadth of expertise available at Gillette, over the last five years Gillette has treated patients from all 50 states, the District of Columbia, Puerto Rico, and more than 20 countries. Gillette typically serves the highest proportion of patients covered by Medicaid in Minnesota. Gillette's patients represent the highest

acuity level in the state of Minnesota. Gillette provides care for children regardless of whether their families have health insurance or ability to pay for their care.

21. Plaintiffs qualify to participate in the DSH Program as hospitals that serve a disproportionate number of Medicaid and uninsured patients. Defendants' illegal actions, requiring the miscalculation of uncompensated costs Plaintiffs incur annually in treating such patients, deprive Plaintiffs of statutorily authorized DSH Payments totaling millions of dollars each year.

22. Defendant Thomas Price is the United States Secretary of Health and Human Services. Defendant Price, by and through his designees at CMS, undertook the illegal and unauthorized actions challenged in this case and has withheld the administrative action plaintiffs have requested to be taken. Defendant Price is sued solely in his official capacity.

23. Defendant Patrick Conway is the Acting Administrator of CMS. CMS is the agency that administers the Medicaid program and the DSH program. Defendant Conway is sued solely in his official capacity.

24. Defendant CMS is the federal agency to which Defendant Price has delegated the authority pursuant to the Social Security Act, 42 U.S.C. §§ 1396a(13)(A)(iv), 1396r- 4(a)(1)(B), to administer the Medicaid and DSH programs.

## STATUTORY AND REGULATORY FRAMEWORK

**A. Minnesota Participates in the Federal Medicaid Program and Must Rigidly Comply with Federally Imposed Medicaid Requirements**

25.     The Medicaid program was established in 1965 as a cooperative venture between the federal and state governments to assist states in providing medical care to eligible individuals.  42 U.S.C. § 1396 *et seq.*  It is designed to provide medical assistance to persons whose income and resources are insufficient to meet the costs of necessary care and services.

26.     States are not obligated to participate in Medicaid, but must rigidly comply with federally imposed requirements if they opt to participate.

27.     The state of Minnesota participates in Medicaid and the Minnesota Department of Human Services administers Minnesota's Medicaid program.

28.     Each state administers its own Medicaid program pursuant to a state Medicaid plan which must be reviewed and approved by the Secretary of HHS ("State Plan").  42 U.S.C. §§ 1396, 1396a.  Upon approval of the plan, a state becomes eligible to receive federal matching funds, or "federal financial participation" ("FFP") for a percentage of the amounts expended, as medical assistance under a State Plan.  42 U.S.C. § 1396b(a)(1).

29.     Defendant CMS reviews Medicaid expenditures by the states to determine whether they are allowable under the Medicaid Act and the State Plan, and whether the appropriate federal matching payment has been claimed for such expenditures.  If Defendant CMS finds that a state expenditure was not allowable under federal policy, it

will disallow it and take action to recoup the federal dollars used for the disallowed expenditure.  42 U.S.C. § 1316(e).

### B. Congress Did Not Permit the Subtraction of Private Insurance Payments in the Medicaid Act to Determine a Hospital's Medicaid Shortfall under the Disproportionate Share Hospital Program

30.        In 1981, Congress established the DSH Program to require that all states participating in the federal Medicaid program provide supplemental Medicaid payments (DSH Payments) to hospitals that serve large numbers of Medicaid and other low-income patients with special needs.  Pub. L. No. 97–35, § 2173(B)(ii), 95 Stat. 357 (codified at 42 U.S.C. § 1396a(13)(A)(iv)).  Congress's intent was to stabilize the hospitals financially and preserve access to health care services for eligible low-income patients.

31.        Congress acknowledged that hospitals serving more than their share of low-income patients with special needs are "an essential element of the Nation's health care delivery systems" because they serve so many of the "patients who other providers view as financially undesirable"—patients who are poor, uninsured, or reliant on Medicaid for their health care.  H.R. Rep. No. 100-391(I) at 524-25 (1987), *reprinted in* 1987 U.S.C.C.A.N. 2313-268, 2313-344, 1987 WL 61524.  Thus, Congress established the DSH Program to "assist these facilities in surviving the financial consequences of competition in the health care marketplace," where they must compete with facilities that do not bear these high uncompensated costs.  *Id.*

32.        Congress expressly referenced children's hospitals as examples to whom DSH payments should be made based on "the proportion of low-income and Medicaid patients…served by such hospitals." 42 U.S.C. § 1396r-4 (a)(2)(D).

33.     The Medicaid Act requires that, in determining Medicaid payment rates, states must "take into account . . . the situation of hospitals which serve a disproportionate number of low-income patients with special needs," 42 U.S.C. § 1396a(a)(13)(A)(iv), and provide an "appropriate increase" in Medicaid payments for hospital services provided by DSH Hospitals.  42 U.S.C. § 1396r-4(a)(1)(B).

34.     A hospital specific limit ("HSL") is the maximum DSH Payment a qualifying DSH Hospital may receive annually.  The Medicaid Act prescribes that the HSL may not exceed the amount of that hospital's "uncompensated costs" of serving Medicaid and low-income patients.  42 U.S.C. § 1396r-4(g)(1)(A).

35.     For purposes of the DSH Program, the Medicaid Act sets forth the precise formula for determining "uncompensated costs" as:

> [T]he costs incurred during the year of furnishing hospital services (as determined by the Secretary and net of payments under this subchapter, other than under this section, and by uninsured patients) by the hospital to individuals who either are eligible for medical assistance under the State plan or have no health insurance (or other source of third party coverage) for services provided during the year.

42 U.S.C. § 1396r-4(g)(1)(A)

36.     Two categories of "uncompensated costs" are eligible for DSH reimbursement under the Medicaid Act:  (1) the costs of services to Medicaid patients (the Medicaid Shortfall component), and (2) the costs of services to uninsured patients (the uninsured component).  Only the calculation of the Medicaid Shortfall component is at issue in this case.

37.     42 U.S.C. § 1396r-4 (g)(1)(A) does not reference private health insurance payments in the Medical Shortfall component of "uncompensated costs."

38.     To ensure that the hospital-specific DSH payment limit has been calculated correctly for each DSH hospital, each state must provide an annual report and audit of its DSH program to Defendant CMS. 42 U.S.C. § 1396r-4(j). This annual report must include:

A. An identification of each disproportionate share hospital that received a payment adjustment under this section for the preceding fiscal year and the amount of the payment adjustment made to such hospital for the preceding fiscal year.

B. Such other information as the Secretary determines necessary to ensure the appropriateness of the payment adjustments made under this section for the preceding fiscal year.

**C. The Final Regulation Promulgated by CMS Does Not Permit the Subtraction of Private Insurance to Determine a Hospital's Medicaid Shortfall under the Disproportionate Share Hospital Program**

39.     In 2005, Defendant CMS issued a proposed rulemaking to implement the reporting and auditing requirements. 70 Fed. Reg. 50,262 (Aug. 26, 2005). After notice and comment, on December 19, 2008, Defendant CMS finalized the rule, effective January 19, 2009. 73 Fed. Reg. 77,904 (Dec. 19, 2008) ("2008 Final rule").

40.     The 2008 Final Rule requires state annual reports to "present a complete, accurate, and full disclosure of all of their DSH programs and expenditures." 42 C.F.R. § 447.299(a).

41.     It further requires states to submit information "for each DSH hospital to which the State made a DSH payment." 42 C.F.R. § 447.299(c).

42.     The 2008 Final Rule is consistent with the Medicaid Act.  It defines "uncompensated care costs" as:

> [T]he total cost of care for furnishing inpatient hospital and outpatient hospital services to Medicaid eligible individuals . . . *less the sum of regular Medicaid FFS rate payments, Medicaid managed care organization payments, [and] supplemental/enhanced Medicaid payments*[.]

42 C.F.R. § 447.299(c)(16) (emphasis added).

43.     42 C.F.R. § 447.299(c)(16) does not reference private insurance or any third party payments in determining "uncompensated costs."

44.     To verify the accuracy of these state annual reports, states must employ an independent auditor to audit the state's compliance with the federal DSH program.   42 U.S.C. § 1396r-4(j).

45.     These independent audits must verify, *inter alia*, that DSH payments made to  each hospital comply with the applicable hospital-specific DSH payment limit.  42 U.S.C. §  1396r-4(j)(2).

46.     Any overpayments that the audit reveals "must be recouped by the state within  one year of their discovery or the federal government may reduce its future contribution."  *Texas  Children's Hosp.*, 76 F. Supp. 3d at 230 (citing 42 U.S.C. § 1396b(d)(2)(C), (D)).

**D. CMS's Guidance Does Not Permit the Subtraction of Private Insurance Payments in Determining a Hospital's Medicaid Shortfall under the Disproportionate Share Hospital Program**

47.     CMS has also developed guidance to help states understand how the hospital-specific  DSH payment limit must be calculated.   *See* General DSH Audit and

Reporting Protocol, CMS- 2198-F [4] ("Guidance"). This document provides the following specific guidance for the auditor with respect to calculating the Medicaid Shortfall:

> To determine the existence of the Medicaid shortfall, Medicaid IP/OP hospital costs (including Medicaid managed care costs) must be measured against Medicaid IP/OP revenue received for such services in the audited State Plan rate year (including regular Medicaid rate payments, add-ons, supplemental and enhanced payments and Medicaid managed care revenues).

*Id.* at 3.

48.     The Guidance does not reference private health insurance payments.

49.      The Guidance provides a step-by-step guide to determine a hospital's hospital-specific DSH payment limit. *Id.* at 5-10.

50.     Step 7 of this step-by-step guide specifies the payments that must be taken into account in calculating the Medicaid Shortfall component of the hospital-specific DSH payment limit. The Guidance specifies in part: "Hospital[s] report revenues from Medicaid managed care organizations, Medicaid payments from other States (regular payments including add-ons, supplemental and enhanced payments, DSH payments), and other non-State Medicaid payments."

51.     Step 7 does not reference private health insurance payments.

52.     CMS has also developed a form to be used to help calculate the hospital-specific DSH payment limit. Definition of Uncompensated Care.[5]

---

[4] Available at https://www.medicaid.gov/medicaid/financing-and-reimbursement/downloads/general_dsh_audit_reporting_protocol.pdf (last visited January 9, 2017).

[5] Available at https://www.medicaid.gov/medicaid/financing-and-reimbursement/downloads/dshreportformat.pdf (last visited January 9, 2017).

53.     This form does not have data input columns for private health insurance.

**E. The Administrative Procedure Act**

54.     The APA prescribes the procedures federal agencies are required to follow in promulgating rules.  A "rule" under the APA is defined as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy."  5 U.S.C. § 551(4).  "Rule making" is the "agency process for formulating, amending, or repealing a rule."  *Id.* § 551(5).

55.     Section 4 of the APA, *id.* § 553, governs the process of agency rulemaking.  Section 4(b) provides that "[g]eneral notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof."  *Id.* § 553(b).  Section 4(c), in turn, provides that, if "notice [is] required by this section," the agency, after giving such notice, "shall give interested persons an opportunity to participate in the rule making through submission of written [comments]" and consider those comments before adopting the rule.  *Id.* § 553(c).  These notice and comment procedures are required for substantive agency actions that have the force and effect of law.

56.     Section 706(2) of the APA requires a reviewing court to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law [or] without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (D).

57.     Medicaid enrollment is available not only to low-income individuals, but also, regardless of family income, to all children born weighing less than 1200 grams, and to children with severe anomalies, heart ailments, cancer, and other long-term and severe illnesses, as well as those with special health care needs and disabilities, including children with significant musculoskeletal and neurological conditions.  Because Plaintiffs serve many underweight, very sick and/or medically fragile children with special health care needs and disabilities, Plaintiffs have an unusually large number of patients who meet the qualifying criteria for Medicaid eligibility for reasons other than income status.

58.      Medicaid does not pay for care of Medicaid-eligible patients that are covered by private health insurance.

59.     On or about January 10, 2010, CMS posted answers to "frequently asked questions" regarding the federal audit and reporting requirements.  *See* Additional Information  on the DSH Reporting and Auditing Requirements. [6]  Question Number 33, and CMS's response thereto, states:

> **33. Would days, costs, and revenues associated with patients that have both Medicaid and private insurance coverage (such as Blue Cross) also be included in the calculation of . . . the DSH limit in the same way States include days, costs and revenues associated with individuals dually eligible for Medicaid and Medicare?**
>
> Days, cost[s], and revenues associated with patients that are dually eligible  for Medicaid and private insurance should be included in the calculation of the  Medicaid utilization rate (MIUR) for the purposes of

---

[6]  Available at https://www.medicaid.gov/medicaid/financing-and-reimbursement/downloads/part-1-additional-info-on-dsh-reporting-and-auditing.pdf (last visited January 9, 2017).

determining a hospital eligible to receive DSH payments. Section 1923(g)(1) does not contain an exclusion for individuals eligible for Medicaid and also enrolled in private health insurance. Therefore, days, costs, and revenues associated with patients that are eligible for Medicaid and also have private insurance should be included in the calculation of the hospital-specific DSH limit. As Medicaid should be the payor of last resort, hospitals should also offset both Medicaid and third party revenue associated with the Medicaid eligible day against the costs for that day to determine any uncompensated amount.

*Id.* at 18.

60.     Despite no reference to private health insurance in 42U.S.C. § 1396r-4(g)(1)(A), 42 C.F.R. § 447.299(c)(16), CMS's Guidance, or the form CMS has provided for the calculation of the hospital-specific DSH payment limit, the policy contained in FAQ 33 is being applied by CMS to require the inclusion of private health insurance in the calculation of the Medicaid Shortfall component of the hospital-specific DSH payment limit.

61.     CMS' action in abruptly and substantively changing the requirements for the calculation of the Medicaid shortfall component of Plaintiffs' uncompensated care costs in violation of the notice and opportunity for comment requirements of the APA has resulted in and will continue to result in drastic reductions in the hospital-specific limits applied to Plaintiffs and the DSH payments it has and will receive.

**CHILDREN'S MINNESOTA AND ITS CURRENT CIRCUMSTANCES**

62.     Medicaid payments fall short of fully reimbursing Children's Minnesota for the actual costs it incurs in treating pediatric Medicaid patients. Medicaid currently reimburses Children's Minnesota an average of only $0.70 for every dollar spent to provide care to pediatric Medicaid patients.

63.     Children's Minnesota sustains substantial losses from treating pediatric Medicaid patients.

64.     Children's Minnesota relies heavily on the DSH program to offset financial losses it suffers in treating a disproportionately high number of Medicaid patients.

65.     From 2011-2015, Children's Minnesota received approximately $74.6 million total dollars in DSH funding.

66.     The 2011-2015 DSH funding accounted for approximately 60% of Children's Minnesota's total operating margin of 3.2%.

67.     Without DSH funding, Children's Minnesota's operating margin would have dropped to 1.3% or to approximately $9.4 million dollars, on average annually.

68.     An operating margin of $9.4 million is not sufficient to sustain Children Minnesota's mission or to fund annual investments in needed technology, care delivery equipment and general facilities required to provide essential pediatric services to the region.

69.     Prior to website appearance of FAQ 33 in January 2010, the state calculated Children's Minnesota's Medicaid Shortfall by adding the hospital's costs for providing Medicaid allowable services attributable to Medicaid patients for whom Children's Minnesota received Medicaid payments and then subtracting all Medicaid payments related to these costs.

70.     In 2014, Children's Minnesota submitted its data report for DSH year 2011 in accordance with the established method.

71.     In 2015, Children's Minnesota learned that the state retained a new auditor, Myers and Stauffer, who directed Children's Minnesota in June 2015 to resubmit its 2011 data and include private insurance payments received on behalf of Medicaid eligible patients.

72.     Myers and Stauffer directed that "[t]he 2008 DSH rule and January, 2010 CMS FAQ #33 both require that a hospital's DSH uncompensated care cost include all Other Medicaid Eligibles." Myers and Stauffer used the term "Other Medicaid Eligibles" to include private health insurance payments received on behalf of Medicaid eligible patients.

73.     Children's Minnesota was then informed by the state that in order to have the DSH audit certified by CMS as provided for in 42 C.F.R. § 447.299, the audits must include private health insurance payments received for Medicaid eligible patients when Medicaid was not billed.

74.     Under protest, Children's Minnesota complied with Myers and Stauffer's direction and included private health insurance payments in its resubmitted 2011 data. Children's Minnesota also submitted its 2012 and 2013 data in the same manner.

75.     In May 2016, Children's Minnesota received its initial 2011 audited results which resulted in a negative HSL and an alleged overpayment of $7,029,587, which turned out to be inaccurately calculated. This was later corrected in a June 14, 2016 letter from Myers and Stauffer: Children's Minnesota has an alleged 2011 overpayment of $4,614,488, subject to recoupment at any time.

76.      The sole reason that an overpayment was recorded by the auditor is the inclusion of private health insurance payments for Medicaid eligible patients in Children's Minnesota's HSL.

77.      On May 27, 2016, Children's Minnesota objected to the 2011 audit results and appealed those results through a letter to the state auditor.  On June 14, 2016, the state auditor denied the appeal and objection to the inclusion of these private health insurance payments for Medicaid eligible patients, stating: "Based on FAQ 33 from CMS, OME data should be reported on Survey Part II.  Therefore, no adjustment to remove inpatient and outpatient OME data has been proposed."

78.      In June 2016, Children's Minnesota received the audited results for 2012 which resulted in a negative HSL and an alleged overpayment was recorded in the amount of $13,800,699, also subject to recoupment at any time.

79.      The sole reason that an overpayment was recorded by the auditor for the 2012 audit is the inclusion of private health insurance payments for Medicaid eligible patients in the HSL calculation.

80.      On November 21, 2016 Children's Minnesota received its 2013 audited results which resulted in a negative HSL and an alleged overpayment of $13, 367,840, which turned out to be inaccurately calculated.  This was later corrected in a December 6, 2016 letter from Myers and Stauffer: Children's Minnesota has an alleged 2013 overpayment of $13,366,591, which is subject to recoupment.

81.      Children's Minnesota has objected to and appealed the results of the 2013 audit.  On December 6, 2016, the state auditor denied the appeal and objection to the

inclusion of these private health insurance payments for Medicaid eligible patients, quoting FAQ 33 and stating: "Based on the above information, OME data should be reported on Part II of the DSH survey.  Therefore, no adjustment to remove inpatient and outpatient OME data has been proposed."

82.     Children's Minnesota will also be forced to repay an additional $13.5 million dollars in DSH funds already received in 2014.

83.     The sole reason for the 2013 and 2014 purported overpayments is the application of FAQ 33 resulting in the inclusion of private health insurance payments for Medicaid eligible patients in Children's Minnesota's HSL.

84.     In total, Children's Minnesota is at risk of recoupment of over $85.5 million dollars, including the projected DSH payment for 2016, because of the illegal application of the policy set forth in FAQ 33.

85.     Once recouped, Children's Minnesota has no legal recourse to recover these monies even if it fully prevails on the merits in this lawsuit.

86.     The harm to Children's Minnesota is the imminent and material reduction of funds available to it, which are necessary to provide essential specialized pediatric health care services to the region.

87.     The $20.1 million dollars in projected DSH payments for 2017 would pay the full cost of the annual salaries and benefits for 156 full-time registered nurses; hospital care for 89 low-weight newborns; hospital care for 1,980 children requiring a hospital stay to treat bronchiolitis; 251 bone marrow biopsies that are done to diagnose leukemia and other blood disorders; 390 surgical procedures to expel excess cerebral

spine fluid from children diagnosed with hydrocephalus; or 202 surgical procedures to repair atrioventricular canal defects (hole in heart).

88.    Recoupment will also harm other important services funded exclusively by Children's Minnesota because it will have to reallocate revenues from other sources to subsidize actual losses it incurs in treating Medicaid patients. Children's Minnesota funds social work programs that address the psychological and social impacts of a child's health care needs on the family system, multi-lingual interpreter services to ensure and support vital communications between the provider, family and patients, a Family Resource Center that offers a broad continuum of support services, and full-service care coordination programs that assist patients and families with managing complex chronic conditions in childhood patients.

89.    The 2017 planned capital expenditures on MRI and construction buildout, expansion of operating rooms, replacement of critical anesthesiology equipment, purchase of vital new pharmacy software that ensures patient safety and replacing aged necessary ultrasound equipment would have to be curtailed or stopped entirely if recoupment occurs.

## GILLETTE AND ITS CURRENT CIRCUMSTANCES

90.    Medicaid payments fall short of fully reimbursing Gillette for the actual costs it incurs in treating pediatric Medicaid patients. Medicaid currently reimburses Gillette an average of only $0.57 for every dollar spent to provide care to pediatric Medicaid patients.

91.     Gillette sustains substantial losses from treating pediatric Medicaid patients.

92.     Gillette relies heavily on the DSH program to offset financial losses it suffers in treating a disproportionately high number of Medicaid patients.

93.     From 2011-2015, Gillette received approximately $20.0 million total dollars in DSH funding.

94.     The 2011-2015 DSH funding accounted for approximately 49.5% of Gillette's total operating margin.

95.     Without DSH funding, Gillette's operating margin would have dropped to 2.0% or to approximately $4.1 million dollars, on average annually.

96.     An operating margin of 2.0% is not sufficient to sustain Gillette's mission or to fund annual investments in needed technology, care delivery equipment and general facilities required to provide essential pediatric services to the region.

97.     Prior to the website appearance of FAQ 33 in January 2010, the state calculated Gillette's Medicaid Shortfall by adding the hospital's costs for providing Medicaid allowable services attributable to Medicaid patients for whom Gillette received Medicaid payment and then subtracting all Medicaid payments related to these costs.

98.     In 2014, Gillette submitted its data report for DSH year 2011 in accordance with the pre-FAQ 33 method, as it was instructed to do.

99.     In 2015, Gillette learned that the state retained a new auditor, Myers and Stauffer, who directed Gillette in June 2015 to resubmit its 2011 data and include private insurance payments received on behalf of Medicaid eligible patients.

100.     Myers and Stauffer directed that "[t]he 2008 DSH rule and January, 2010 CMS FAQ #33 both require that a hospital's DSH uncompensated care cost include all Other Medicaid Eligibles." Myers and Stauffer used the term "Other Medicaid Eligibles" to include private health insurance payments received on behalf of Medicaid eligible patients.

101.     Gillette was then informed by the state that in order to have the DSH audit certified by CMS as provided for in 42 C.F.R. § 447.299, the audits must include private health insurance payments received for Medicaid eligible patients when Medicaid was not billed.

102.     Under protest documented in a November 13, 2015 letter, Gillette complied with Myers and Stauffer's direction and included private health insurance payments in its resubmitted 2011 data. Gillette also submitted its 2012 and 2013 data in the same manner, under protest documented in a November 13, 2015 letter (2012 data) and a May 25, 2016 letter (2013 data).

103.     In March, 2016, Gillette received its 2011 audited results which resulted in a negative HSL and an alleged overpayment of $3,219,016, subject to recoupment at any time.

104.     The sole reason that an overpayment was recorded by the auditor is the inclusion of private health insurance payments for Medicaid eligible patients in Gillette's HSL.

105.     In June, 2016, Gillette received the audited results for 2012 which resulted in a negative HSL and an alleged overpayment was recorded in the amount of $2,824,499, also subject to recoupment at any time.

106.      The sole reason that an overpayment was recorded by the auditor for the 2012 audit is the inclusion of private health insurance payments for Medicaid eligible patients in the HSL calculation.

107.     In November, 2016, Gillette received its 2013 audited results which resulted in a negative HSL and an alleged overpayment of $3,185,270, which is subject to recoupment.

108.     The sole reason for the 2013 purported overpayment is the application of FAQ 33 resulting in the inclusion of private health insurance payments for Medicaid eligible patients in Gillette's HSL.

109.     Gillette will also be forced to repay an additional $3,980,841 in DSH funds already received for 2014.

110.     The sole reason for the 2014 purported overpayments is the application of FAQ 33 resulting in the inclusion of private health insurance payments for Medicaid eligible patients in Gillette's HSL.

111.     In total, Gillette is at risk of recoupment of $26.2 million total amount of DSH overpayments under FAQ 33, for years 2011-2016, including the projected DSH payment for 2016, because of the illegal application of the policy set forth in FAQ 33.

112.     Once recouped, Gillette has no legal recourse to recover these monies even if it fully prevails on the merits in this lawsuit.

113.     The harm to Gillette is the imminent and material reduction of funds available to Gillette, which are necessary to provide essential specialized pediatric health care services to the region.

114.     The $9.2 million sum of DSH payments subject to recoupment for 2011, 2012, and 2013 in DSH payments for 2011, 2012, and 2013, which are subject to recoupment at any time—would pay the full cost of 87 Full Time Equivalents (FTE's), which equates to 8.4% of total hospital staffing.  Recoupment will also harm other important services funded exclusively by Gillette because Gillette will need to reallocate revenues from other sources to subsidize actual losses it incurs in treating Medicaid patients.  Gillette funds outreach clinics to rural areas and a critical access dental program that together have costs in excess of revenues of $1.1 million dollars.  Social work and Child & Family support programs, including interpreter services cost $2.8 million dollars, and a 24/7 telehealth service to serve patients and their local physicians throughout Minnesota cost $1.1 million dollars.  These programs together exceed the estimated DSH funding and it would be difficult to continue them at the same level without that funding.

115.     In addition to the harm Gillette faces from the imminent and material reduction of funds available to it, Gillette is also harmed by the recoupment of future DSH funds.  Because of FAQ 33, any future DSH funds will be deemed overpayments and subject to recoupment.  Generally Accepted Accounting Principles would hold that these DSH funds cannot be accrued as income or spent, and would be held as liabilities to be repaid.  This would severely curtail future capital expenditures impacting Gillette's ability to maintain a safe environment of care, assure medical technologies are up to date

and safe, and assure we provide appropriate instruments and diagnostic equipment for diagnoses and treatment of complex conditions in the most effective and safe manner.

## COUNT I

### Violation of 5 U.S.C. § 706(2)(C)

116.     Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 115.

117.     The Medicaid Act unambiguously sets forth the calculation to be used in determining the Medicaid Shortfall component of the hospital-specific DSH payment limit.   42 U.S.C. § 1396r-4(g)(1)(A).

118.     The Medicaid Act expressly provides that only "payments under this subchapter" are to be subtracted from the total costs of furnishing hospital services to individuals who are eligible for medical assistance under the State Plan.  *Id.*  "[T]his subchapter" refers to the Medicaid Act.  *See id*.

119.     The policy referenced in FAQ 33 regarding the inclusion of private health insurance in the calculation of the Medicaid Shortfall component of the hospital-specific DSH payment limit is contrary to the plain language of and unambiguous intent of Congress in enacting 42 U.S.C. § 1396r-4(g)(1)(A) and/or is an unreasonable interpretation of the Medicaid Act.

120.     Section 706(2)(C) of the APA requires a reviewing court to "hold unlawful and set aside" agency action "in excess of statutory jurisdiction, authority, . . . or short of statutory     right."  5 U.S.C. § 706(2)(C).

121.     In promulgating and enforcing the policy referenced in FAQ 33, the defendants acted in excess of their statutory jurisdiction, their statutory authority, and short of statutory right under the Medicaid Act.

122.     The policy referenced in FAQ 33 is therefore unlawful and should be set aside under 5 U.S.C. § 706(2)(C).

## COUNT II

### Violation of 5 U.S.C. § 706(2)(A), (D)

123.     Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 122.

124.     After notice-and-comment rulemaking, defendant CMS duly adopted regulations implementing the DSH program audit and reporting provisions of the Medicaid Act.  42 U.S.C. § 1396r-4; 42 C.F.R. Parts 447 and 455.  These regulations are unambiguous.   They expressly provide the methodology for calculating the Medicaid Shortfall component of a DSH's hospital-specific DSH payment limit as follows:  "the total cost of care for furnishing inpatient hospital  and outpatient hospital services to Medicaid eligible individuals . . . less the sum of regular  Medicaid FFS rate payments, Medicaid managed care organization payments,  supplemental/enhanced Medicaid payments, . . . ."   42 C.F.R. § 447.299(c)(16).

125.     Despite the existence of these unambiguous regulations, Defendant CMS, without  notice or opportunity for comment, issued the policy referenced in FAQ 33 which  requires the inclusion of private health insurance in the calculation of the Medicaid Shortfall component of a DSH's hospital-specific DSH payment limit.

126.     The policy referenced in FAQ 33 amends the unambiguous substantive language of 42 C.F.R. § 447.299(c)(16) by adding private health insurance payments to the calculation of the Medicaid Shortfall component of a DSH's hospital-specific DSH payment limit.

127.     The policy referenced in FAQ 33 constitutes "final agency action for which there is no other adequate remedy." 5 U.S.C. § 704.

128.     Defendants are enforcing the policy referenced in FAQ 33 by, among other things, requiring independent auditors to follow them in auditing states' compliance with the DSH program and requiring states other than New Hampshire, Texas and Washington to recoup any overpayments those policies create.

129.     Section 706(2)(A) of the APA proscribes agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Section 706(2)(D) of the APA proscribes agency action that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

130. The policy referenced in FAQ 33 regarding the inclusion of private health insurance in the calculation of the Medicaid Shortfall component of a DSH's hospital-specific DSH payment limit has the force and effect of law. As such, it is a legislative rule that substantively amends the existing federal regulations without following the APA's notice-and-comment procedures. *See* 5 U.S.C. §§ 553(b)-(d).

131. Thus, the policy referenced in FAQ 33 is arbitrary, capricious, an abuse of discretion, not in accordance with law, and constitutes agency action taken without

observance of procedure required by law.  FAQ 33 should therefore be vacated pursuant to 5 U.S.C. § 706(2)(A), (D).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Children's Minnesota and Gillette respectfully request this Court enter judgment in Plaintiffs' favor, and

a. Declare that the policy referenced in FAQ 33 that requires the inclusion of private health insurance in the Medicaid Shortfall component of the DSH uncompensated care calculation is in excess of Defendants' statutory authority, or is short of statutory right and therefore is a violation of the APA;

b. Declare that the policy referenced in FAQ 33 that requires the inclusion of private health insurance in the Medicaid Shortfall component of the DSH uncompensated care calculation is arbitrary, capricious and otherwise not in accordance with law and therefore violates the APA;

c. Declare that the policy referenced in FAQ 33 that requires inclusion of private  health insurance in the Medicaid Shortfall component of a DSH's uncompensated care calculation has been imposed without observance of procedure required by law and therefore violates the APA;

d. Preliminarily enjoin the Defendants from enforcing, applying, or implementing (or  requiring states to enforce, apply, or implement) the policy referenced in FAQ 33 that requires inclusion of private health

insurance in the Medicaid Shortfall component of a DSH's uncompensated care calculation;

e. Vacate the policy referenced in FAQ 33 that requires inclusion of private health insurance in the Medicaid Shortfall component of a DSH's uncompensated care calculation;

f. Order Defendants to notify the state Medicaid program in Minnesota that, pending further order by the Court, the enforcement of FAQ 33 is enjoined and that Defendants will take no action to recoup any federal DSH funds provided to Minnesota based on the state's noncompliance with FAQ 33; and

g. Grant Plaintiffs such other relief as may be necessary and appropriate or as the Court deems just and proper.

Dated:  February 16, 2017

Respectfully submitted,

GRAY PLANT MOOTY

By:    /s/ Gregory R. Merz
        Gregory R. Merz (#185942)
        500 IDS Center
        80 South Eighth Street
        Minneapolis, MN 55402
        Telephone: (612) 632-3000
        Facsimile: (612) 632-4444
        gregory.merz@gpmlaw.com

        BAKER & HOSTETLER LLP
        Geraldine E. Edens  (*admitted pro hac vice*)
        (Washington, DC/437056)
        Email: gedens@bakerlaw.com

        Christopher H. Marraro  (*admitted pro hac vice*)
        (Washington, DC/395152)
        Email: cmarraro@bakerlaw.com

        Washington Square, Suite 1100
        1050 Connecticut Avenue, NW
        Washington, DC  20036-5304
        Telephone:  202.861.1500
        Facsimile:   202.861.1783

        *Attorneys for Plaintiffs Children's Minnesota and Gillette*